1
2
3
4
5
6
7

**Benjamin P. Davis**
California Bar No. 275918
**Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California  92101-5008
Telephone: (619) 234-8467
Benjamin_Davis@fd.org

Attorneys for Melchor Orozco-Orozco

8
9
10
11

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**(HONORABLE TODD W. ROBINSON)**

| | |
|---|---|
| **United States of America,** | ) Case No: 21cr-2349-TWR |
| Plaintiff, | ) Date: September 10, 2021 |
| | ) Time: 1:30 p.m. |
| vs. | ) |
| | ) **Notice of Motion and Motion to** |
| **Melchor Orozco-Orozco,** | ) **Dismiss the Indictment Under** |
| | ) *Arlington Heights* |
| Defendant. | ) |
| | ) |
| | ) |

12
13
14
15
16
17
18

19
20

**To:    Randy Grossman,** Acting United States Attorney; and
**Amanda T. Muskat,** Assistant United States Attorney:

21
22

**Please take notice** that on September 10, 2021, at 1:30 p.m., Mr. Orozco-Orozco will ask this Court to enter an order granting the following motions:

23
24
25
26
27
28

## Motions

The defendant, Melchor Orozco-Orozco, by and through his attorneys, Benjamin P. Davis and Federal Defenders of San Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this Court to grant the following motions:

**(1)** Dismiss the Indictment under *Arlington Heights.*

Respectfully submitted,


Dated:    August 27, 2021          */s/ Benjamin P. Davis*
                                    **Benjamin P. Davis**
                                    Federal Defenders of San Diego, Inc.
                                    Attorneys for Mr. Orozco-Orozco

1
2
3
4
5

**Benjamin P. Davis**
California Bar No. 275918
**Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Benjamin_Davis@fd.org

6

Attorneys for Melchor Orozco-Orozco

7

### UNITED STATES DISTRICT COURT

8

### SOUTHERN DISTRICT OF CALIFORNIA

9

### (HONORABLE TODD W. ROBINSON)

10

11   **United States of America,**

12                          Plaintiff,

13        vs.

14   **Melchor Orozco-Orozco,**

15                          Defendant.

16

17

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No:  21cr-2349-TWR

**Memorandum of Law in Support of Mr. Orozco-Orozco's Motion to Dismiss the Indictment Under** *Arlington Heights*

18
19

## I.

### Introduction

20

21

22

23

24

25

26

27

In April 2020, the Supreme Court relied on historical evidence of a state legislature's racial motives to strike down a criminal law enacted a century earlier. *See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). Although the law had been later reenacted with no evidence of animus, the Court refused to ignore the "racially discriminatory *reasons* that [the state had] adopted [its] peculiar rules in the first place." *Id.* at 1401 (emphasis in original). Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id.* at 1401 n.44.

28

Like the law in *Ramos*, the law criminalizing illegal reentry into the United States at 8 U.S.C. § 1326 has an "uncomfortable past" that must be examined. *Id.* Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race"[1] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[2] They claimed Mexicans were "poisoning the American citizen."[3] They sought to keep the country's blood "white and purely Caucasian."[4] They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[5] Not only did this racism underlie the original version of § 1326, the law has disparately impacted Mexicans and other Latino individuals in the century since.

Because the facts and historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose. If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Orozco's criminal charge.

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census. gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[2] *See infra* at 8, 10, 11, 12, 13, 17.

[3] *See infra* at 15, 17.

[4] *See infra* at 13.

[5] *See infra* at 13–14.

At a minimum, if the Court believes Mr. Orozco has not shown a discriminatory purpose and a disparate impact, it should hold an evidentiary hearing. At this hearing, Mr. Orozco will present expert testimony as further evidence of the law's discriminatory origins. The Court should also schedule an evidentiary hearing if the government submits evidence that the Court believes may be sufficient to rebut Mr. Orozco's evidence. But if the government does not attempt to rebut his evidence, or cannot do so, the Court should dismiss the indictment.

## II.

## Argument

**A.    Legal framework: the *Arlington Heights* test.**

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways. First, a law may discriminate on its face. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities may apply a facially neutral law in a discriminatory way. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See, e.g., Arlington Heights*, 429 U.S. at 265–68.

Here, Mr. Orozco challenges § 1326 only under the third rationale, so the legal framework of *Arlington Heights* applies. *Arlington Heights* clarified that the *effect* of a racially discriminatory law does not alone make it unconstitutional—challengers must also show "[p]roof of racially discriminatory *intent* or *purpose*" at the time of the law's passage. *Id.* at 265 (emphasis added). Determining whether a purpose was discriminatory requires "a sensitive inquiry into such circumstantial and direct evidence

of intent as may be available." *Id.* at 266. *Arlington Heights* gave a non-exhaustive list of relevant factors to consider in this determination, including:

1) the impact of the official action and whether it bears more heavily on one race than another;

2) the historical background of the decision;

3) the specific sequence of events leading to the challenged action;

4) the [legislature's] departures from normal procedures or substantive conclusions; and

5) the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429 U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66 (emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold that a challenger need not prove discrimination was the "sole purpose" of the challenged action—only that it was a "'motivating factor'").

Once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id.* at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated equal protection. *Id.* at 231.

Similarly, the Ninth Circuit has applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican-American Studies program in the Tucson school district. *See Arce v. Douglas*, 793 F.3d at 981. During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples." *Id.* at 978. Finding that such comments created a genuine issue of material fact as to whether the law was "motivated, at least in part, by an intent to discriminate against [Mexican-American Studies] students," the Court reversed the district court's grant of summary judgment and remanded for a full trial. *Id.* at 981.

Moreover, a recent decision by the Chief Judge of the District of Nevada agreed with the very arguments that Mr. Orozco advances here and found that § 1326 was unconstitutional due to the pervasive racial animus that had motivated both its original passage in 1929 and its re-enactment in 1952. *United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) (attached as <u>Appendix A</u>). The *Carrillo-Lopez* court applied the *Arlington Heights* framework and concluded both that the

law had been passed with a discriminatory purpose and that it continues to disparately impact Mexican and other Latino people. *Id.* at *25.

These cases show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups.[6] As Mr. Orozco will show, the same animus infected § 1326 to an equal (or even greater) degree.

**B.     Congress enacted illegal reentry with a discriminatory purpose: under the *Arlington Heights* factors, racism and eugenics were a "motivating factor" in the passage of illegal reentry laws.**

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. And as recent Supreme Court precedent confirms, courts must consider this historical evidence in determining the statute's constitutionality.

A close examination of the political context underlying the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *Arlington Heights*, 429 U.S. at 265. They were the *primary* factor.

**1.     "The historical background of the decision."**

Historians often refer to the 1920s as the "Tribal Twenties"—a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled

---

[6] Courts apply strict scrutiny to the question of whether a law was "motivated by a racial purpose or object" under *Arlington Heights. See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted).

the politics of restriction."[7] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[8] and "the 'contamination' of Anglo-American society."[9]

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[10] Many politicians, especially those popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Exhibit A, Hernández declaration, at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[11] During the remainder of the decade, legislators aimed for "'America [to] cease to be the "melting pot."'"[12] Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[13]

These fears of non-white immigration were bolstered by the growing acceptance of eugenics—a theory that "captured the imagination of many of America's leading intellectuals."[14] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[15] The leader of a major scientific institution contended that neither

---

[7] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[8] *Id.* at 23.

[9] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[10] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).

[11] Emergency Immigration Act of 1921, Pub.L. 67-5, 42 Stat. 5 (1921).

[12] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).

[13] Hernández, *supra*, at 28.

[14] Yang, *supra*, at 35.

[15] *Id.* at 8.

education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[16] And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[17]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Record Office.[18] Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi Germany, used as a template.[19] During the 1920s, Dr. Laughlin testified before Congress multiple times and produced four reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population." Exhibit B, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representative*, 70th Cong. 70.1.4 , pp. 2, 3 (1928). Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade.[20]

**2.** <u>"The specific sequence of events leading to the challenged action."</u>

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants—which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such

---

[16] Okrent, *supra*, at 3.

[17] *Id.* at 38. Those sterilization laws were affirmed in the now infamous decision *Buck v. Bell*, 274 U.S. 200, 207 (1927).

[18] Ngai, *supra*, at 24.

[19] *Harry Laughlin and Eugenics*, Truman State University. Accessible at https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

[20] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981).

law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1890 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[21] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska.[22] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[23]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere. This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[24] These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Exhibit A, Hernández declaration, at 3. As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit C, Representative Box (TX). "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619.

So despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill "leaves open the doors for

---

[21] Ngai, *supra*, at 24–25.

[22] *Id.* at 26.

[23] *Id.* at 35.

[24] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

perhaps the worst element that comes into the United States—the Mexican peon."[25]
Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants,
stating that "the average Italian is as much superior to the average Mexican as a full-
blooded Airedale is to a mongrel." Exhibit D, Representative O'Sullivan,
"Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900. Legislators
"proposed bill after bill" restricting Mexican immigration but none could survive
opposition from southwestern growers. Exhibit A, Hernández declaration, at 5. To
solve this problem, a group of key figures began to strategize a new type of immigration
bill that would approach immigration from a criminal—rather than a civil—angle.

    **3.**  <u>"The relevant legislative or administrative history."</u>

    After passage of the National Origins Act of 1924, the Department of Labor
(which governed the Bureau of Immigration) began implementing Congress's new
quota system.[26] Then-Secretary of Labor James Davis was a strong advocate of
Dr. Laughlin and his eugenics theories—even using them as the basis for policies he
had developed and published under the title "Selective Immigration or None."[27] Davis
warned that the "rat type" was coming to the United States, and that these "rat men"
would jeopardize the American gene pool.[28]

    Secretary Davis was nevertheless torn between his belief in eugenics and his
responsibility to maintain a large labor supply for the railroad and agriculture
industries.[29] So together with devout racist (and suspected Ku Klux Klan member)
Senator Coleman Blease,[30] Davis developed a compromise—Congress would

---

[25] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

[26] *See* Vought, *supra*, at 174–79.

[27] *Id.*

[28] *Id.* at 174–75.

[29] *Id.* at 216.

[30] For biographical and historical context about Senator Blease, s*ee* B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of

criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[31] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[32] The southwest growers were in agreement—as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exhibit A, Hernández declaration, at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee. Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18. In one speech at an immigration conference, Rep. Box had explained that

> [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood….The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

*Id.* Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Exhibit C at H3619.

---

Southern History, 62:1, pp. 57–86 (Feb. 1996), *available at* http://www.jstor.com/stable/2211206.

[31] Ian MacDougall,, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

[32] *Id.*

Box was joined by the influential Chairman of the House Immigration and Naturalization Committee, Representative Albert Johnson of Washington. Chairman Johnson—for whom the 1924 "Johnson-Reed" National Origins Act was named—was an "energetic and vehement racist and nativist."[33] He headed the Eugenics Research Association, a group that opposed interracial marriage and supported forced sterilizations.[34] He also proudly described his 1924 law as a "bulwark against 'a stream of alien blood, with all its inherited misconceptions respecting the relationships of the governing power to the governed.'"[35] Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[36]

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[37] In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Exhibit F, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Exhibit F, at H2462.

---

[33] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242–43 (2002).

[34] *Id.*

[35] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

[36] Okrent, *supra*, at 3.

[37] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

Chairman Johnson soon convened hearings on new immigration legislation. *See* Exhibit G, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926). At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exhibit G, at 30. In response to this letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exhibit G, at 30. Rep. Box added, "I have some letters, Mr. Chairman, just like that." Exhibit G, at 30

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. Exhibit B, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exhibit B, at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exhibit B, at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exhibit B, at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the women of the upper classes." Exhibit B, at 19. The job of any government, Dr. Laughlin explained, was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity." Exhibit B, at 19. By deporting or excluding the "lower races" from the country, Dr. Laughlin contended, "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." Exhibit B, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle of applied eugenics" to "do everything possible" to reduce crime by "debarring and deporting" more people. Exhibit B, at 25. Rep. Box agreed, stating, "we will have to control immigration to suit our own needs or we will lose our national character," which would "spell destruction for the future of America." Exhibit B, at 25.

Dr. Laughlin even compared the drafters of deportation laws to "successful breeders of thoroughbred horses," who would never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." Exhibit B, at 44. One such successful breeder he knew "weeds out from the lower levels and recruits by purchase"—a process that is "analogous to immigration in man." Exhibit B, at 44–45. "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future generations are concerned, there is considerable real basis for [this] comparison." Exhibit B, at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exhibit B, at 45. Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exhibit B, at 44. In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exhibit B, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit H, S. Rep. No. 1456, at 1 (1929). This report

was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exhibit H, at 2.

The following week, Senator Blease presented this bill on the Senate floor, where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929) p. S2092. The full Senate passed the bill with almost no discussion or debate. Exhibit I, at S2092. Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. Exhibit J, S. Rep. No. 2397 (1929).

During debate on the bill, Rep. Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Exhibit C, Cong. Rec. 1929. Rep. Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exhibit C, Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929) p. H3619. Rep. Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exhibit C, at H3619. Rep. Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." Exhibit C, Representative Fitzgerald, "Deportation of Aliens." *Congressional Record* (1929) p. H3620. Minutes later, the bill passed the House of Representatives. Exhibit C, H3621. The president signed it into law three days later. Exhibit L, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

This legislative history easily clears the low threshold of showing that racism and eugenics were a "motivating factor" under the first three factors. Like other *Arlington Heights* cases, passage of the racially-motivated law followed a predictable pattern. A

broad social movement founded on principles of white supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471 U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to disenfranchise blacks"). Dr. Laughlin, a notorious eugenics "expert," promoted theories of racial inferiority through multiple reports and testimony to Congress. *Compare Democratic National Committee*, 948 F.3d at 1009 (local Republican chair widely shared a "racially tinged" video suggesting Hispanics were involved in ballot fraud). Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box (along with Secretary of Labor Davis) promoted these theories and repeatedly endorsed them during legislative sessions. *Compare id.* (state senator repeated "unfounded and often farfetched allegations" of ballot fraud); *Arce*, 793 F.3d at 978–79 (legislators accused ethnic studies program of inciting "racial warfare"). Other legislators expressed similar sentiments. *See id.* And even Congressmen who might not have otherwise endorsed racially motivated legislation were consistently advised of the "inferiority" of the "Mexican race" during legislative sessions in the five years leading up to the law's passage. *Compare Democratic National Committee*, 948 F.3d at 1041 (invoking the "cat's paw doctrine). In other words, the evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets—if not exceeds—the evidence in other *Arlington Heights* cases where race was found to be a "motivating factor."

   **4.** <u>"The legislature's departures from normal procedures or substantive conclusions."</u>

   Examining the fourth *Arlington Heights* factor—whether a decisionmaker departs from "normal procedures or substantive conclusions"—requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013). Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (citing the city's decision to "disregard the zoning advice of its own experts"). Here, not only do the overtly racist statements of legislators during

the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation. Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding. And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[38] illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers. *See* Exhibit C, at H3621 (stating that 81,506 Canadians entered the United States in 1928). If the 1929 Act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board. But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen." And a representative from Wisconsin complained only about *Mexicans* taking jobs, not Canadians. *See* Exhibit C, at H3619. These irregularities show that not only was Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

---

[38] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for repealing the National Origins Act).

**5.** <u>"The impact of the official action and whether it bears more heavily on one race than another."</u>

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[39] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[40] And the number of prosecutions has soared—in the last three years, the number of § 1326 cases has risen by nearly 40% to 22,077,[41] making illegal reentry one of the most common federal felonies today.

In sum, applying the five *Arlington Heights* factors shows that racism and eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts must consider this historical evidence in determining whether a statute is constitutional.

**B.** **Recent Supreme Court cases confirm that the 1952 enactment of § 1326 cannot cleanse the discriminatory intent from the 1929 statute.**

Two recent Supreme Court cases confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality. In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in *Ramos*). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured

---

[39] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6 at 138–39 (UNC Press, 2017).

[40] Hernández, *supra* n. 6, at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.

[41] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

the laws' original animus, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id.* at 1401 n.44. Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law prohibiting families from using state-sponsored scholarships at religious schools. *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020). The majority relied on the law's "checkered tradition" of underlying religious discrimination, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." *Id.* at 2259.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted). Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id.* Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying Montana's law, concluding that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id.* at 2273 (quoting *Ramos*, 140 S. Ct., at 1396, n.44).

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.[42] But *Ramos* and *Espinoza* both confirm not only that must courts examine

---

[42] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

the racial motivations of a law at the time of its passage, but that later reenactments do not cleanse the law of its original taint.

The government may also argue that even if racism and eugenics were a "motivating factor" in § 1326's original passage, the law currently serves other legitimate purposes. But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision). Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*

## C.   The Court should find that the 1952 enactment was also motivated by discriminatory intent.

Even if later reenactments of a discriminatory statute *could* cleanse that statute of its motivating racism, this Court should consider and adopt the factual findings of *United States v. Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330 (D. Nev. Aug. 18. 2021). In that case, the district court considered contemporaneous evidence from the passage of the 1952 enactment and found several plain indicia of an intent to discriminate against Mexican and other Latino people. *Id.* at * 10.

First, the district court noted the 1952 Congress had completely failed to debate or otherwise discuss the problematic origins of the re-entry statute, despite having debated these problems in other national origin statutes being considered around the same time. *Id.* at *11. This silence, the district court found, indicated that Congress had either "ignored' the racial animus of the predecessor of the re-entry statute (and only of the re-entry statute), or had decided to adopt that animus. *Id.*

Second, the district court pointed out that President Truman had vetoed the bill expressly because it "would perpetuate injustices of long standing against many other nations of the world," and because the bill would "continue, practically without

change," the discriminatory practices of the 1924 and 1929 versions. *Id.* at *12 (citations omitted). Accordingly, the district court found, Congress's decision to override that veto without commenting on the law's racist forebears "is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id.*

The district court also relied on evidence that many of those in government who supported the bill did so with racist slurs. For example, the court found that then-Deputy Attorney General Peyton Ford had written a letter in 1951 in support of the bill to the Chairman of the Senate Judiciary Committee, Pat McCarran (D-Nev.), describing the bills targets as "wetbacks" and calling for the statute to be more punitive in nature. *Id.* at * 13 (citation omitted). In fact, the district court found, Congress nicknamed the bill the "Wetback Bill," and intended to "criminaliz[e] Mexican immigrant laborers while shielding employers" of those same laborers. *Id.* at *15. Finally, the district court noted that, to this day, Congress has been aware that § 1326 disproportionately affects Mexican and Latino people, and has remained silent in the face of that evidence. *Id.*

The *Carrillo-Lopez* court's decision is, of course, not binding on this Court. However, Mr. Orozco urges this Court to examine the evidence upon which that distict court relied, and to adopt those findings in this case to rule that the 1952 enactment was also motivated by a discriminatory purpose.

**D.    Section 1326 continues to disparately impact Mexican and other Latino defendants.**

*Arlington Heights* requires challengers to show that a law was enacted with a discriminatory purpose and disparately impacts a particular group. *See* 429 U.S. at 265. Here, not only were racism and eugenics a discriminatory purpose motivating the enactment of the first border crossing laws, such laws continue to disparately impact Mexican and other Latino defendants.

Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1326 today, the overwhelming number of Border Patrol arrests along the southern border are of Mexicans or people of Latino origin. In 2000, over 97% of persons apprehended at the border were Mexican. In 2005, Mexicans

made up 86% of apprehensions, and in 2010, 87%.[43] In the last decade, Mexicans have made up a smaller percentage of arrestees due to increased migration from Central America, but combined, the two groups easily constitute the overwhelming majority of border crossers.[44] *See The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704 (9th Cir. 2009) (recognizing a disparate impact on Latino people where the neighborhoods were "trending" Latino during the relevant period).

Overall, these disparities are comparable to disparities that have supported other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818 F.3d at 497 (concentrating most low-income housing in neighborhoods that are 75% Hispanic); *Arce*, 793 F.3d at 978 (targeting a program, 90% of whose enrollees were of Mexican or other Hispanic origin); *Community Improvement*, 583 F.3d at 704 (excluding 71% Latino areas from benefits, while extending those benefits to other areas that were only 48% Latino).

The executive branch continues to wield § 1326 as a tool of mass prosecution that disproportionately affects Mexicans and Latin Americans. In April 2018, then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[45] The following month, Sessions made clear at an address delivered in San Diego that "the Department of Homeland Security is now referring 100 percent of illegal

---

[43] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[44] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

[45] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, *available at*: https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up those cases."[46]

Both Sessions and Stephen Miller, a senior policy advisor to President Trump and the architect of the zero-tolerance policy,[47] drew inspiration from the discriminatory immigration laws of the 1920s. In a series of leaked emails, Miller lauded the immigration policies of this era, suggesting to a journalist, "This would seem a good opportunity to remind people about the heritage established by Calvin Coolidge, which covers four decades of the 20th century"—i.e., the decades between the 1924 Act and its repeal in 1965.[48] Likewise, in a 2015 interview with Breitbart, Sessions expressed alarm at the rising percentage of "non-native born" Americans, noting that when immigration levels were "about this high in 1924," the President and Congress "changed the policy, and it slowed down immigration significantly."[49] He warned that repeal of those policies in 1965 had primed the country for a "surge far past what the situation was in 1924."[50]

---

[46] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[47] *See, e.g.*, Julie Hirschfeld Davis & Michael D. Shear, *How Trump Came to Enforce a Practice of Separating Migrant Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

[48] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[49] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[50] *Id.*

This evidence demonstrates that § 1326 has disparately impacted Mexican and Latino immigrants and continues to do so today. Combined with Mr. Orozco's showing that racial discrimination was a "motivating factor" in its passage, he has satisfied his initial burden under *Arlington Heights* to demonstrate that the law violates equal protection.

**E.     The burden of proof shifts to the government.**

Because Mr. Orozco has shown both a discriminatory purpose and a disparate impact underlying § 1326, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n.21. *See also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor"). The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Orozco has not yet shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing. Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *Democratic National Committee,* 948 F.3d at 998 (referencing ten-day bench trial); *Arce,* 793 F.3d at 991. Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights. Hunt*, 526 U.S. at 545.

At this evidentiary hearing, Mr. Orozco will present testimony from expert witnesses, including Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, and Dr. Benjamin Gonzalez O'Brien, Associate Professor of

1  Political Science at San Diego State University. *See* Exhibit M, Curriculum Vitae of Prof.

2  Lytle Hernández; Exhibit N, Curriculum Vitae of Prof. Gonzalez O'Brien. *See Hunter*,

3  471 U.S. at 228–29 (crediting the "testimony and opinions of historians" to determine a

4  legislature's discriminatory intent under *Arlington Heights*). Both experts have written

5  extensively on the Undesirable Aliens Act of 1929 and can testify about the historical

6  events surrounding its passage. At the end of this hearing, if the government has not

7  carried its burden to show that the crime of illegal reentry would have been enacted

8  without a racially discriminatory motive, § 1326 is unconstitutional, and the Court must

9  dismiss the charge.

**IV.**

<u>Conclusion</u>

Because Mr. Orozco has made the requisite showing on the five *Arlington Heights*

factors, the Court should find that § 1326 violates the Equal Protection and Due

Process Clauses and grant his motion and dismiss the indictment.

Respectfully submitted,

<u>Dated</u>: August 27, 2021

s/*Benjamin P. Davis*
**Benjamin P. Davis**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Orozco-Orozco